IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN TANENBAUM, et al., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | No. 13-4132 |
| v. | : | |
| | : | |
| CHASE HOME FINANCE LLC | : | |
| Defendant. | : | |

MEMORANDUM

**MCHUGH, J.**                                                                                                      **August 18, 2014**

This case arises out of a residential mortgage foreclosure action pending in state court in suburban Philadelphia, dating back to 2010. The issue presented is the obligation of a lender to exercise forbearance where a borrower expresses an intention to cure defaults, but falls short of full compliance. Based on the record presented, I am persuaded that actions speak louder than words, and conclude that the lender, Chase Home Finance, was within its rights to proceed to foreclosure.

Homeowners Susan and Alan Tannenbaum are the plaintiffs here and are defending against foreclosure in state court. They originally alleged multiple violations of state and federal law against their mortgagor, Chase Home Finance LLC ("Chase"). Over the course of the litigation, the plaintiffs have dropped their claims based on the Fair Debt Collection Act, the Real Estate Settlement Procedures Act, and Pennsylvania's Act 6, 41 P.S. § 101 *et seq*. Only two theories of recovery remain: alleged violation of the Unfair Trade Practices Act, 73 Pa. Stat. § 201-1 – §201-9.3, and claims arising out of the mortgage contract.

1

Defendant has moved for summary judgment. For the reasons below, the motion will be granted.

I.     Facts

The house in question was built for the Tannenbaums in 1995. Joint Appendix ("JA") 94 (deposition of Ms. Tannenbaum). The couple now live separately, but Ms. Tannenbaum has lived in the house with her children for nearly twenty years.

In 2001, the couple decided to refinance their original mortgage to obtain a fixed interest rate. Together they executed a promissory note to Chase Manhattan for a mortgage on the property on June 22, 2001. JA 37-57. The Tannenbaums also signed a "Waiver of Escrow Account." JA 58. The waiver provided that the Tannenbaums would pay taxes on the property themselves instead of sending payments to an escrow account that Chase would have used to pay the taxes.

In residential mortgage transactions, the house itself provides the collateral for the loan. In order to protect that collateral, many lenders require the borrower to prepay taxes into an escrow account to guard against tax delinquency. Because governmental liens for unpaid taxes take priority in most jurisdictions, lenders wish to guard against the loss of their priority position as first lien holder by making certain that taxes remain current. When lenders grant a waiver to a borrower such as the waiver provided to the Tannenbaums here, it is an implicit expression of the lender's confidence that the borrower will satisfy any taxes due in a timely fashion.

For several years, neither the Tannenbaums nor Chase had any trouble with the mortgage. The Tannenbaums paid both mortgage and taxes on the property, and Chase seems to have had no complaints about the Tannenbaums' performance of their obligations under the mortgage and

2

waiver of escrow account agreement. In 2007, the plaintiffs failed to pay the taxes for the property.

On May 26, 2008, Chase issued a letter to the Tannenbaums. JA 59 (letter from Chase). The letter notified the Tannenbaums that they had not paid their 2007 real estate taxes. The letter further informed them pursuant to the Waiver of Escrow Account agreement that failure to pay the taxes within 15 days might result in the establishment of an escrow account. The letter warned that the escrow account would result in "a subsequent increase in your mortgage payment amount" and that "if any taxes remain delinquent, Chase may immediately establish an escrow account and pay the taxes on your behalf." JA 59 (letter from Chase). The Tannenbaums did not cure the default or respond to the letter.

Two years later, Chase issued another letter to the Tannenbaums. JA 61 (letter from Chase). The letter again notified the Tannenbaums that they had not paid their taxes for 2007 and that failure to pay within 15 days may immediately result in the establishment of an escrow account. JA 61 (letter from Chase). The Tannenbaums did not cure the default or respond to the letter.

On or about June 16, 2009, Chase paid the delinquent 2007 real estate taxes in the amount of $10851.57. JA 63 (letter from Chase). Also on June 16, 2009, Chase sent Mr. Tannenbaum a letter informing him that Chase had paid the taxes and established an escrow account from which Chase would in the future pay taxes due. The letter informed him that Chase would provide a "new mortgage payment schedule." JA 63. In her deposition, Ms. Tannenbaum maintains that she did not receive this "conversion" letter. JA 137 (deposition of Ms. Tannenbaum).

3

On or about June 29, 2009, Chase sent the Tannenbaums an "Annual Escrow Account Disclosure Statement." JA 64. The statement showed a negative escrow balance of $10,851.57. The statement explained that the new mortgage payment would effectively double, rising from $1,958.48 to $4,349.37. $1,591.45 of the payment was a "shortage spread" to cover the cost of recouping the taxes Chase already paid.

After receiving notice that her monthly payment to Chase was to change by over 200%, Ms. Tannenbaum says she began making phone calls to Chase to understand the reasons for the dramatic increase. JA 140 (deposition of Ms. Tannenbaum). Her testimony is that "no one could explain to me why suddenly my mortgage payment was $4,300." JA 140 (deposition of Ms. Tannenbaum).

On July 30, 2009, Ms. Tannenbaum sent the Bucks County Tax Claim Bureau a check in the amount of $11,018.69 for the delinquent 2007 taxes. JA 210 -11 (a copy of the cashier's check and receipt); JA 113 (deposition of Ms. Tannenbaum).

Unaware that Mrs. Tannenbaum had tendered that payment, Chase continued to pay taxes on the property. On September 4, 2009, Chase received a refund of the 2007 taxes it had originally paid. JA 73 (detailed transaction history).

Around the end of July or beginning of August 2009, Ms. Tannenbaum set up automatic payments of $1,958.40 and left for Florida to care for her ailing mother for around three months. JA 98-99 (deposition of Ms. Tannenbaum). Chase did not accept those automatic payments, because they were less than the full amount Chase required. After arranging for the schedule of automatic payments, Ms. Tannenbaum made no further inquiries and did not realize that Chase had declined the payments as insufficient until returning from Florida later in the fall of 2009. JA 98-99 (deposition of Ms. Tannenbaum).

Chase produced another Annual Escrow Account Disclosure Statement on October 28, 2009. JA 66-67. Because Chase had credited the refund against the escrow account, this new statement reflected a much reduced shortage—only $81.74—and a correspondingly lower monthly mortgage payment: $2,786.78. JA 66-67. The revised monthly payment was still higher than before the default, because Chase had invoked its right to require the borrower to fund annual property taxes as a part of each payment.

Ms. Tannenbaum called Chase on November 5, 2009. JA 69 (customer service log); JA 158-61 (deposition of Ms. Tannenbaum). The parties dispute the substance of that conversation. Ms. Tannenbaum asserts that she asked what she needed to pay to bring her account current. She claims that she was told to pay an amount around $8000. The amount would be applied to late principal and interest on her mortgage and would make her account current. JA 158-59.

Chase offers a different version of the conversation. The Chase customer service representative's notes of the call include a comment, "wants escrow removed/ adv can request for the removal must make sure that negative esc bal of $6811.67 is paid first before they send the request to remove escrow." JA 69. Chase's position is that at the time of the call, Ms. Tannenbaum's account had a negative escrow balance of $6811.87 and a negative principle and interest of $8127.68. Chase asserts that Ms. Tannenbaum would have needed to pay both amounts to bring her account current, and that the log reflects only her request, and not the bank's agreement to apply the funds as she sought.

Ms. Tannenbaum counters that Chase informed her that they would in fact apply the $8127.68 to bring her mortgage up to date. In her deposition she said, "they didn't tell me that I had to pay the [$]6,811 first before they would credit the $8000, and I paid more than [$]8,127 because I paid the late payments. So this is incorrect. This is not a reflection of the conversation

5

that day." JA 159-60 (Deposition of Ms. Tannenbaum). She further explained "had they did what we agreed on in the conversation, they would have taken that $8,311, they would have applied it to the principal and interest, bringing me up to date [….] [T]hey never told me [to pay the escrow too.] I would have paid it. I had it in my account. I ended up paying it a few weeks later." JA 166-67 (deposition of Ms. Tannenbaum) (emphasis added).

Almost immediately after the phone call, Ms. Tannenbaum sent Chase a check in the amount of $8127.68. JA 222 (detailed transaction history). Chase applied only $585.51 to the mortgage principle and $1,372.97 to interest, the rest to escrow and suspense. JA 222.

Both the substance and significance of the November 5 phone call are certainly in dispute. If the factual record were frozen as of that point, and Chase then foreclosed, I would likely find this dispute material, and deny summary judgment. But there is more to the record than plaintiffs wish to acknowledge.

Having failed to pay property taxes for two years, and having requested forbearance from Chase, Ms. Tannenbaum then missed her next mortgage payment, due in December. JA 175 (deposition of Ms. Tannenbaum). She was also late with her January payment. Finally, she sent Chase a check for the December payment, the January payment, and the February payment a few days after the January payment was due. JA 176-77 (deposition of Ms. Tannenbaum); JA 227 (copy of the check). Ms. Tannenbaum also sent a check for $6,811.67—the amount of escrow due. JA 227.

Chase refused to accept the payments. Chase sent the Tannenbaums two letters dated January 30, 2010 explaining that the funds were insufficient to cure her default. JA 228-29.

On January 26, the law firm of Phelan Hallinan & Schmieg, LLP sent the Tannenbaums a notice of default and intent to foreclose. JA 78-82 (Notice of Intent to Foreclose). The notice

6

informed the Tannenbaums that their total amount past due was $15,332.96. JA 80 (Notice of Intent to Foreclose). That amount was not tendered, and a foreclosure action was brought against them.

As of July 2014, the Tannenbaums' house remains in foreclosure. Because of the pendency of the foreclosure action, Chase has refused to accept any further payments, although the Tannenbaums, through their counsel at oral argument, represent that the money to satisfy their obligations is available.

## II.     Standard for Summary Judgment

Currently before this court is Chase's motion for summary judgment of the plaintiffs' remaining claims. The standard for summary judgment motions is well settled. This court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    Unfair Trade Practices Consumer Protection Law

The plaintiffs' complaint alleges that Chase violated Pennsylvania's Unfair Trade Practices Consumer Protection Law. The UTPCPL exists to "protect the public from fraud and unfair or deceptive business practices." *Burke v. Yingling*, 666 A.2d 288, 291 (Pa. Super. Ct.

7

1995). The act authorizes recovery for plaintiffs who have suffered losses due to "unfair methods of competition" and "unfair or deceptive acts or practices." 73 P.S. §201-9.2; 73 P.S. § 201-2(4).

The act defines specific forbidden practices, such as "passing off goods or services as those of another" and "[a]dvertising goods or services with intent not to sell them as advertised." 73 P.S. § 73-201(4)(i)-(xxi). A plaintiff alleging a violation of the UTPCPL must describe which particular practice or practices a defendant violated. *Romeo v. Pittsburgh Assoc.*, 787 A.2d 1027, 1033 (Pa. Super. Ct. 2001) ("In order to state a claim under the UTPCPL, a plaintiff must allege one or more of the 'unfair or deceptive practices' set forth in 73 P.S. § 201-2(4)(i)-(xxi)."). A plaintiff must also allege that she justifiably relied on the deceptive conduct. *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 44-46, 928 A.2d 186, 201-03 (2007).

Plaintiffs focused their argument on two specific practices banned by the UTPCPL. First, plaintiffs argue Chase engaged in practices "causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with […] another." 73 Pa. § 201-2(4)(iii). Second, citing to the statute's catch-all provision, plaintiffs argue that defendant engaged in "other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. § 201-2(4)(xxi).

The plaintiffs have failed to establish their claim under 73 Pa. § 201-2(4)(iii). There are no facts in the record that suggest Chase engaged in any conduct that might lead to confusion about Chase's "affiliation, connection, or association with […] another." 73 Pa. § 201-2(4)(iii). Even if Chase's conduct confused the plaintiffs, there is nothing in the record to suggest Chase "held [itself] out to be affiliated, connected or associated with, or […] certified by, another entity." *Com v. Parisi*, 873 A.2d 3, 12 (Pa. Cmmw. Ct. 2005).

8

There is a factual dispute regarding whether Chase engaged in "other fraudulent or deceptive conduct" as required by the UTCPCL's catch-all. Plaintiff states that Chase's representation informed her on November 5, 2009 that a payment of $8127.68 would bring her account current. She maintains that, in reliance on that statement, she immediately submitted the required payment to Chase. She further argued in her deposition that if she had been told she needed to provide an additional escrow payment before Chase would apply her $8,127.68 check to her missed mortgage payments, she could have, and would have, submitted that extra payment. Chase disagrees with the plaintiffs' description of the November 5 phone call. According to Chase, the customer service representative correctly informed the plaintiff about the required additional payment. If the plaintiffs' version of the facts is correct, and Chase took precipitous action to foreclose, I would agree that a reasonable jury might find such conduct to be deceptive,[1] rendering summary judgment inappropriate.

Despite this factual dispute, in light of plaintiffs' subsequent defaults, they cannot establish that this alleged misrepresentation was the cause of foreclosure. This is an essential element of the claim: "To bring a private cause of action under the UTPCPL, a plaintiff must show … that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports Inc.*, 578 Pa. 479, 501,854 A.2d 425, 5 (2004). Regardless of how one construes the November 5, 2009 phone call, the pattern of defaults persisted, because as Ms. Tannenbaum concedes, she failed to pay the mortgage in December and was late paying the mortgage in January. JA 175

---

[1] See *Johnson v. MetLife Bank, N.A.*, 883 F.Supp 2d 542, 549 (E.D.Pa. 2012):

> Certainly this testimony creates a dispute of fact as to what was said between Plaintiff and Lobacz, and how Plaintiff could get the impression that he himself was entering into a "hectom" loan with a seven percent interest rate which he would pay off in monthly payments. The dispute is material because, contrary to MetLife's implication, a reasonable jury could infer from Plaintiff's testimony that Lobacz misled or deceived him as to the details of the reverse mortgage transaction. Accordingly, we conclude that there is a genuine issue of material fact that precludes the entry of summary judgment on Plaintiff's UTPCPL catch-all provision claim against MetLife.

9

(deposition of Ms. Tannenbaum). By the end of January 2010, given a repeated pattern of defaults, Chase would be within its rights to demand that plaintiffs cure the default, even if the Nov. 5, 2009 phone call had resolved previous missed payments.

Because the plaintiffs have not established that the conduct they contend was deceptive brought about the foreclosure, the court must grant summary judgment on this claim.

### IV. Breach of Contract

The plaintiffs' remaining claims are rooted in contract principles. Plaintiffs offer two theories of breach in their Supplemental Brief: promissory estoppel and breach of the implied duty of good faith and fair dealing.

**Promissory Estoppel**

Pennsylvania has adopted Section 90 of the Restatement (Second) of Contracts. *Central Storage & Transfer Co. v. Kaplan*, 487 Pa. 485, 489, 410 A.2d 292, 294 (1979) (recognizing the doctrine of promissory estoppel). To state a claim for promissory estoppel, a plaintiff must show:

> 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.

*Crouse v. Cyclops Industries*, 560 Pa. 394, 403, 745 A.2d 606, 610 (2000).

The plaintiffs argue that Chase made a binding promise on November 5, 2009 to consider the plaintiffs' account current upon a payment of $8,127.66. That argument fails because the November 5, 2009 conversation, even if it transpired as plaintiffs claim, related to the performance of a written contract that already bound the plaintiffs. Promissory estoppel may not be invoked to supersede the rights established by the contract itself. *Carlson v. Arnot-Ogden*

10

*Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) ("In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted."); *Jodek Charitable Trust, R.A. v. Vertical Net Inc.*, 412 F.Supp. 2d 469, 478 (E.D. Pa. 2006) ("[T]he parties do not dispute that their relationship is governed by enforceable written contracts supported by consideration. Thus, because 'promissory estoppel has no application when parties have entered into an enforceable agreement, […] Plaintiff cannot maintain a claim for promissory estoppel.") (internal citations omitted). *Isobunkers, L.L.C. v. Easton Coach Co.*, 2010 WL 547518, at *4 (E.D. Pa. 2010) ("[P]romissory estoppel claims should not be used to modify an enforceable contract.").

Even if the issue were to be viewed more broadly, as a matter of equitable estoppel, plaintiffs' continued defaults described above would undermine their entitlement to relief.

**Duty of Good Faith and Fair Dealing**

Plaintiffs also argue breach of contract on the basis of a violation of the duty of good faith and fair dealing. "Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement [….] Good faith has been defined as 'honesty in fact in the conduct or transaction concerned." *Donahue v. Federal Exp. Corp.* 753 A.2d 238, 242 (Pa. Super. Ct. 2000).

There are, however, limitations on the scope of that implied duty. It does not impose obligations on parties that contradict those included in the contract. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000) ("[T]hat duty is not divorced from the specific clauses and cannot be used to override an express contractual term."). Nor does the implied duty "compel a lender to surrender rights which it has been given by statute or by the

11

terms of its contract." *Creeger Brick and Bldg. Supply Inc. v. Mid-State Bank and Trust Co.*, 560 A.2d 151, 154 (Pa. Super. Ct. 1989). Furthermore it cannot "modify or defeat" the creditor's legal rights. *Id.*

The implied duty of good faith and fair dealing unquestionably requires that a party deal "honestly" with other parties to the contract. For example, it might violate good faith "for a secured creditor, aware that his debtor had defaulted on currently due loan repayments, to persist in assurance that he was about to make further advances of needed operating capital, and then, without notice, exercise his security rights to seize the delinquent debtor's entire stock in trade." *Skeels v. Universal C.I.T. Credit Corp.*, 335 F.2d 846, 851 (3d Cir. 1964). Here, in contrast, Chase acted with forbearance in waiting more than two years before invoking its right to establish an escrow account, and was within its rights in refusing to accept automatic payments during the fall of 2009 that were less than was due under the mortgage. Even if a jury were to construe the November 5, 2009 conversation wholly in accord with plaintiffs' view of the case, their continued defaults, the lack of any payment in December, and late payment in January, gave Chase the right to protect its interest prospectively under the terms of the mortgage contract, particularly when viewed against the prior history of unpaid taxes.

The Tannenbaums argue that Chase "thwarted" their efforts to bring the mortgage current, but even as to that point, with the notice of foreclosure they were offered the opportunity to cure with a payment of $15,332.96.

Chase's conduct might be criticized as hard-nosed, but the record does not support the conclusion that it is unlawful. Given the subsequent course of litigation in two different courts, its conduct might also be considered short-sighted, because, ironically, despite the sporadic nature of their payments, the Tannenbaums appear to have the ability to pay the mortgage. In the

final analysis, however, unless it is acting unlawfully, a party to a contract has the right to insist upon rigid enforcement of its terms, even when such enforcement has harsh consequences.

An appropriate order follows.

                                                  /s/ Gerald Austin McHugh
                                     United States District Court Judge